IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **VILLAS AT PARKSIDE PARTNERS** | § | |
| **d/b/a VILLAS AT PARKSIDE, et al.**, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:06-CV-2371-L** |
| | § | (consolidated with CA No. 3:06-CV-2376-L |
| **THE CITY OF FARMERS BRANCH**, | § | and CA No. 3:07-CV-0061-L) |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING PERMANENT INJUNCTION

Before the court is Plaintiffs'[1] Motion for Partial Summary Judgment,[2] filed February 22,

2008.[3] After carefully considering the motions, responses, replies, record, and applicable law, the

court **grants** Plaintiffs' Motion for Partial Summary Judgment.

## I. Procedural History

Plaintiffs seek summary judgment of two of their claims regarding the constitutionality of

Farmers Branch Ordinance 2903 (the "Ordinance"), an ordinance adopted by the Farmers Branch

---

[1]The Villas Plaintiffs are the owners and operators of apartment complexes in Farmers Branch. The Vasquez Plaintiffs include residents of apartment complexes in Farmers Branch as well as the owners and managers of apartment complexes in the city. Defendant, the City of Farmers Branch, is herein referred to as "the city," "Farmers Branch," or "Defendant."

[2]Plaintiffs move for judgment on two of their claims: (1) the Ordinance is preempted, and (2) the Ordinance violates the Due Process clause of the Fourteenth Amendment to the United States. In addition to these claims, the Villas Plaintiffs assert claims pursuant to 42 U.S.C. § 1981 and for violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and Section 214.903 of the Texas Local Government Code. *See* Second Am. Compl. (Mar. 9, 2007). The Vasquez Plaintiffs also pleaded claims for violation of the Equal Protection Clause of the Fourteenth Amendment, the Contracts Clause, and the First Amendment to the United States Constitution, and pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq*., and 42 U.S.C. § 1981. *See* First Am. Compl. for Decl. and Inj. Relief (Mar. 22, 2007).

[3]Defendant's Motion for Summary Judgment, filed February 22, 2008, is also pending. Given the procedural posture of the case, the court defers ruling on this motion.

City Council on January 22, 2007. The Ordinance was the second iteration of a law originally adopted by the City Council on November 13, 2006, Ordinance 2892. A state court issued a temporary restraining order enjoining implementation of Ordinance 2892 on January 9, 2007, finding that Ordinance 2892 "may have been approved and adopted in violation of the Texas Open Meetings Act." Thereafter, the City Council repealed Ordinance 2892 and adopted the Ordinance. The Ordinance called for an election to allow the voters of Farmers Branch to vote for or against it. Ordinance (hereinafter, "Ord.") § 5.

On May 12, 2007, the voters of Farmers Branch approved the Ordinance by a margin of 4,058 "for," and 1,941 "against." The Ordinance was to go into effect May 22, 2007. *Id.* § 7. On May 21, 2007, however, the court granted Plaintiffs' applications for temporary restraining order, temporarily enjoining the enforcement of the Ordinance and preventing the Ordinance from going into effect. *See* Mem. Op. and Order Granting TRO (May 21, 2007). The court held a preliminary injunction hearing on June 5, 2007, extended the temporary restraining order with the parties' consent until June 19, 2007, and granted Plaintiffs' requests for a preliminary injunction on June 19, 2007. Since the court issued a preliminary injunction prohibiting the city from effectuating or enforcing the Ordinance, the city filed a motion to dismiss the Villas Plaintiffs' claims for compensatory damages. The court granted the motion and dismissed with prejudice the claims for compensatory damages. Accordingly, only requests for declaratory and injunctive relief remain.[4]

---

[4]On January 22, 2008, the City of Farmers Branch passed Ordinance 2952, which also relates to the citizenship or immigration status of tenants in that city. On January 28, 2008, the city moved for leave to file a counterclaim for declaratory judgment, seeking a declaration from the court that Ordinance 2952 is "constitutional and valid under applicable law and will be, upon its taking effect, enforceable." Proposed Def.'s Orig. Countercl. for Decl. J., Prayer ¶ 1. By separate order, the court has denied the city's request for the court to issue an advisory opinion on the validity of Ordinance 2952.

## II.    Ordinance 2903

The title of the Ordinance is:

> An ordinance repealing Ordinance 2892; adopting revised apartment complex rental licensing standards, mandating a citizenship certification requirement pursuant to 24 [Code of Federal Regulations] 5 et seq.; repealing Ordinance 2900; calling an election for May 12, 2007, to consider this ordinance (for or against); providing for enforcement; providing a penalty clause; providing a severability clause; and providing an effective date.

Ord. Title (original in all capital letters).  The preamble to the Ordinance states that "the City Council finds and determines that the benefits and protections provided through the HUD citizenship and immigration status certification processes would also benefit the City;" that "the City of Farmers Branch is authorized to adopt ordinances pursuant to its police power to protect the health, safety, and welfare of its citizens;" and that "the City of Farmers Branch has determined that it is a necessity to adopt citizenship and immigration certification requirements for apartment complexes to safeguard the public, consistent with the provisions of 24 CFR 5, et seq." *Id.* Preamble.[5]  The Ordinance also states that "the purposes of this Ordinance are to promote the public health, safety, and general welfare of the public." *Id*.

The Ordinance amends Chapter 26, Article IV of the City's Code of Ordinances relating to apartment complex rental.  Specifically, the Ordinance adds language to section 26-116(d)(3) and creates a new section 26-116(f) titled "Citizenship or Immigration Status Verification." *Id*. § 3(A)-(B).

---

[5]The "whereas" clauses of the Ordinance are incorporated by section 1 of the Ordinance:  "[A]ll matters stated hereinabove are found to be true and correct and are incorporated into the body of this Ordinance by reference as if copied in their entirety."  Ord. § 1.

Subsection (1) of the new section (f) defines various terms used in the section, and states that the definitions are consistent with 24 CFR 5.504. *Id*. § 3(B)(f)(1). The term "Evidence of citizenship or eligible immigration status" is defined as "the documents which must be submitted to evidence citizenship or eligible immigration status for residency in the United States." *Id*. "Citizen" is defined as "a citizen or national of the United States." *Id*. "National means a person who owes permanent allegiance to the United States, for example, as a result of birth in a United States territory or possession." *Id*. Noncitizen is defined as "a person who is neither a citizen nor national of the United States." *Id.*

Subsection (2) provides: "The owner and/or property manager shall require as a prerequisite to entering into any lease or rental arrangement, including any lease or rental renewals or extensions, the submission of evidence of citizenship or eligible immigration status for each tenant family consistent with subsection (3)." *Id*. § 3(B)(f)(2).

Subsection (3) relates to "[e]vidence of citizenship or eligible immigration status" and lists the evidence required to show tenants' citizenship or immigration status. *Id*. § 3(B)(f)(3). This section sets out the documentation that tenants must provide. Noncitizens must provide: (1) a signed declaration of "eligible immigration status;" (2) a "form designated by [United States Immigration and Customs Enforcement][6] as acceptable evidence of immigration status;" and (3) a "signed verification consent form." *Id*. § 3(B)(f)(3)(ii)(a)-(c).

Subsection (4) outlines the owner and/or property managers' obligations with regard to the evidence of citizenship or "eligible immigration status:"

---

[6]The Ordinance defines "ICE" as "Immigration and Customs Enforcement Department." The court believes that this is a misnomer, as United States Immigration and Customs Enforcement is a component of the United States Department of Homeland Security, and therefore not a separate United States Department.

(i)     The owner and/or property manager shall request and review original documents of eligible citizenship or immigration status. The owner and/or property manager shall retain photocopies of the documents for its own records and return the original documents to the family. Copies shall be retained by the owner and/or property manager for a period of not less than two (2) years after the end of the family's lease or rental.

(ii)    The owner and/or property manager shall require that each family member submit evidence of citizenship or immigration status only once during continuous occupancy. The owner and/or property manager is prohibited from allowing the occupancy of any unit by any family which has not submitted the required evidence of citizenship or eligible immigration status under this Section . . . .

*Id*. § 3(B)(f)(4)(i)-(ii).

Section 4 of the Ordinance provides both a clause regarding severability of portions of the Ordinance and a statement regarding the intent and effect of the Ordinance in relation to federal immigration law:

If any section, paragraph, subdivision, clause or phrase of this Ordinance shall be adjudged invalid or held unconstitutional, the same shall not affect the validity of this Ordinance as a whole or any part of any provision thereof other than the part so decided to be invalid or unconstitutional. The intention of this Ordinance and the exercise of the police power of the City is not an attempt or effort to promulgate new and additional Immigration Laws or to conflict in any manner with the Federal Government's promulgation and enforcement of Immigration Laws.

*Id.* § 4.

Finally, the Ordinance includes a section describing penalties for violation. Specifically, section 6 of the Ordinance provides: "any person violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not

to exceed $500 and a separate offense shall be deemed committed upon each day during or on which a violation occurs or continues." *Id*. § 6.

Plaintiffs have moved for partial summary judgment, asking the court to enter judgment on their claims that (1) the Ordinance is preempted by federal law and (2) the Ordinance violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. They request that the court enter partial summary judgment on these claims, declare the Ordinance unconstitutional, and permanently enjoin the enforcement and effectuation of the Ordinance.[7]

## III.    Legal Standard – Motion for Summary Judgment

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not

---

[7]Although Plaintiffs' motion also includes a request for the award of attorney's fees and costs, the reply filed by the Villas Plaintiffs makes clear that Plaintiffs intend to move for an award of attorney's fees pursuant to Rule 54(d) of the Federal Rules of Civil Procedure if the court grants their motion and enters judgment on their behalf.

make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

# IV.    Analysis

## A.    Introduction

In the court's previous opinions in this case, it made clear that it is well aware that the Ordinance has been the subject of much scrutiny by the media and the public, and citizens from Farmers Branch and beyond have communicated their support of the Ordinance to the court.  While recognizing the frustration of citizens and public officials regarding the lack of enforcement of federal immigration laws, the court reiterates that the "will of the people" in endorsing the Ordinance does not bestow the imprimatur of constitutionality on the Ordinance.  The court is not to rubber-stamp politically popular enactments.  A court that approves an ordinance merely because it is politically popular abdicates its judicial obligation to decide independently and on existing legal precedent whether the ordinance passes constitutional muster.  This is not the first time – nor will it be the last – that a court has held a politically popular ordinance to be unconstitutional.

## B.    Parties' Contentions

The court has already reviewed and considered extensive briefing regarding the constitutionality of the Ordinance and the merits of Plaintiffs' claims.  Plaintiffs filed both applications for temporary restraining order and preliminary injunction, and Defendant had an opportunity to respond to both.  The court held a preliminary injunction hearing and the parties submitted additional supplemental briefing.  Defendant relies on its previous briefing, incorporating its prior responses and attaching two additional recent cases;[8] Plaintiffs also incorporate their earlier

---

[8]Although the court does not rule on Defendant's motion at this time, because its response to Plaintiffs' motion incorporated its motion for summary judgment, the court has reviewed and considered both Defendant's Motion for Summary Judgment and Defendant's response to Plaintiffs' Motion for Partial Summary Judgment.

briefing, but they have also filed an extensive motion for summary judgment. They urge the court to adhere to its prior decisions and grant them partial summary judgment.

The city "refer[s] the [c]ourt to the recent decisions in *Gray v. City of Valley Park, Missouri*, No. 07-0088, 2008 WL 294294 (E.D. Mo. Jan. 31, 2008), and *Arizona Contractors Association, Inc. v. Candelaria*, No. 07-2496, 2008 WL 343082 (D. Ariz. Feb. 7, 2008), as they relate to the issues of preemption, due process, and equal protection." Docket No. 130, Def.'s Mot. for Summ. J. 4. While it attaches copies of these two opinions, Defendant does not make any additional argument regarding these decisions, compare the facts in these cases to the instant facts, or specifically address how these cases support the arguments it has previously made.

The court has reviewed the *Gray* and *Arizona Contractors* cases and finds that Defendant's reliance on these recent decisions is inapposite. Neither case deals with an ordinance similar to the Ordinance in this case; the courts in those cases considered the constitutionality of ordinances that created requirements for employers, not landlords, in considering the immigration status of their employees, not tenants. *Gray*, 2008 WL 294294, at *1; *Arizona Contractors*, ___ F. Supp. 2d ___, 2008 WL 343082, at *1.

The preemption analysis in these cases focuses on a specific provision of 8 U.S.C. § 1324a that states: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit and refer for a fee of employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2); *Gray*, 2008 WL 294294, at *9; *Arizona Contractors*, ___ F. Supp. 2d ___, 2008 WL 343082, at *6. Defendant has never relied on this provision in its prior briefing, and the court does not consider its passing citation to these two cases an argument that somehow the Ordinance should not be preempted because it would

fall within this provision. Such an argument, even if that is what Defendant intends to put forth, is undermined by the plain language of the statute, which refers explicitly to "licensing or similar laws" related to employment.

Finally, the mechanism for determining the status of aliens in the *Gray* and *Arizona Contractors* cases is completely different from that required by the Ordinance. The Farmers Branch Ordinance relies upon owners and property managers to review immigration documents and determine if a tenant or potential tenant has an "eligible immigration status." The ordinances at issue in *Gray* and *Arizona Contractors* require employers to use the federal government's E-Verify program to determine the eligibility of potential employees. *Gray*, 2008 WL 294294, at *17; *Arizona Contractors*, 2008 WL 343082, at *12-13. Accordingly, in those ordinances, federal classifications of status are used. These facts are distinguishable from the enforcement mechanism of the Ordinance, which adopts classifications based on regulations promulgated by the United States Department of Housing and Urban Development.

For these reasons, the court determines that Defendant's reliance upon the *Gray* and *Arizona Contractors* decisions is unwarranted given the differences between those ordinances and the Ordinance before the court. The court determines that these opinions do not disturb its prior conclusions that the Ordinance is preempted and violates the Due Process clause of the United States Constitution.

### C.     Preemption Claim

The court turns first to Plaintiffs' claims that the Ordinance is preempted by the Constitution and federal law. The Supremacy Clause of the Constitution states, "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall

be bound thereby . . . ." U.S. Const., art. VI, cl. 2. "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const., art. VI, cl. 2; *Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824); *Savage v. Jones*, 225 U.S. 501, 533 (1912); and *California v. ARC America Corp.*, 490 U.S. 93, 101 (1989)).

The Supreme Court has held that state immigration laws can be preempted by federal law in several ways. *De Canas v. Bica*, 424 U.S. 351 (1976). In that case, the Court noted that only the federal government may issue a "regulation of immigration," which the court defined as "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id*. at 355. The Court also noted that "[e]ven when the Constitution does not itself commit exclusive power to regulate a particular field to the Federal Government, there are situations in which state regulation, although harmonious with federal regulation, must nevertheless be invalidated under the Supremacy Clause." *Id*. at 356. The Court went on to note: "[F]ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Id*. (brackets and ellipsis in original) (quoting *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)).

District courts, construing the Supreme Court's decision in *De Canas*, have noted that the decision creates three tests for determining whether a state immigration law or regulation is preempted by federal law:

> Under the first test, the Court must determine whether a state statute is a regulation of immigration. Since the power to regulate immigration is unquestionably exclusively a federal power, any state statute which regulates immigration is constitutionally prescribed.

Under the second test, even if the state law is not an impermissible regulation of immigration, it may still be preempted if there is a showing that it was the clear and manifest purpose of Congress to effect a complete ouster of state power–including state power to promulgate laws not in conflict with federal laws with respect to the subject matter which the statute attempts to regulate. In other words, a statute is preempted where Congress intended to occupy the field which the statute attempts to regulate.

Under the third test, a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Stated differently, a statute is preempted under the third test if it conflicts with federal law making compliance with both state and federal law impossible.

*League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755, 768 (C.D. Cal. 1995) (hereinafter "*LULAC*") (internal citations and quotations omitted); *see also Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1055 (S.D. Cal. 2006); *Equal Access Education v. Merten*, 305 F. Supp. 2d 585, 601-602 (E.D. Va. 2004). The court now addresses the first *De Canas* test.

### 1. "Regulation of Immigration"

The United States Constitution grants Congress the exclusive power to "establish an uniform Rule of Naturalization" and to "regulate Commerce with foreign Nations." U.S. Const. art. I § 8, cl. 4, 3. The Court has repeatedly held that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas*, 424 U.S. at 354 (citing *Passenger Cases*, 7 How. 283 (1849); *Henderson v. Mayor of New York*, 92 U.S. 259 (1876); *Chy Lung v. Freeman*, 92 U.S. 275 (1876); *Fong Yue Ting v. United States*, 149 U.S. 698 (1893)); *see also Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The States enjoy no power with respect to the classification of aliens. This power is committed to the political branches of the Federal Government. . . . [O]nly rarely are such matters relevant to legislation by a State.") (internal citations and quotations omitted); *Toll v. Moreno*, 458

U.S. 1, 10 (1982) ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders."); *Traux v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration . . . is vested solely in the Federal government."). The Supreme Court, nonetheless, "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *De Canas*, 424 U.S. at 355. Rather, a court must look to whether the state law is a "regulation of immigration," defined by the Supreme Court as "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id*.

In *De Canas*, the Supreme Court upheld a California statute that provided: "No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." *Id*. at 353 n.1. In determining that this statute was not a regulation of immigration, the court noted that California "adopt[ed] federal standards." *Id*. at 355. Another California proposition was held to be an impermissible regulation of immigration where the statute itself provided classification of noncitizens. *LULAC*, 908 F. Supp. at 772. The California proposition defined individuals as "(1) citizens; (2) lawfully admitted as a permanent resident; or (3) lawfully admitted for a temporary period." *Id*. The district court in that case held that "the state has created its *own* scheme setting forth who is, and who is not, entitled to be in the United States." *Id*. (emphasis in original).

A district court in Virginia, considering state university admission standards for immigrant applicants, held that after *De Canas*, the question under the first test is "whether defendants' . . . policies simply adopt federal standards, in which case they are not invalid under the Supremacy

Clause, or instead create and apply state standards to assess the immigration status of applicants, in which case the policies may run afoul of the Supremacy Clause." *Equal Access Education*, 305 F. Supp. 2d at 603.

### a.  Adoption of HUD Regulations

Plaintiffs argue that the Ordinance is a "regulation of immigration" because it creates a new classification of immigration by incorporating the definitions used in 24 CFR 5.504, regulations issued by the United States Department of Housing and Urban Development outlining restrictions on federal housing subsidies to noncitizens.  Plaintiffs contend that the Ordinance precludes several classes of noncitizens – who lawfully reside in the country but are ineligible for housing assistance – from renting an apartment in Farmers Branch.  *See* 42 USC § 1436a(a)(1) (allowing federal housing assistance to "alien[s] lawfully admitted for permanent residence" but "excluding, among others, alien visitors, tourists, diplomats, and students who enter the United States temporarily . . .").

Plaintiffs argue that the Ordinance itself is a "regulation of immigration" because restricting an individual's ability to live in Farmers Branch is tantamount to determining whether that individual is lawfully resident in the country.  At the preliminary injunction, counsel for Plaintiffs argued:

> Who can be here and the conditions upon which they can live includes Farmers Branch setting up a system that says you because of your immigration status cannot be here in Farmers Branch.  You must go somewhere else.  And it raises the specter of cities all over the place enacting a patchwork of inconsistent systems to enforce, to regulate immigration.  Because of your immigration status, you cannot come into our town, and denying housing is effectively saying you cannot be here.  You cannot live here.

Trans. of Prelim. Inj. H'rg (June 5, 2007) (hereinafter, "Trans.") 75:7-16.  Plaintiffs cite *Traux v. Raich*, a case in which the Supreme Court struck down an employment statute and held that "[t]he

assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode . . . ." 239 U.S. at 42. Plaintiffs also point to *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948), where the Court held that states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." Plaintiffs argue that because the Ordinance excludes certain legal residents– such as students, tourists, and diplomats– from lawfully residing in Farmers Branch, it is as if the City of Farmers Branch is imposing new regulations regarding who may enter the United States.

Defendant responds that while the Ordinance does refer to 24 CFR 5, the Ordinance provides that the evidence that noncitizens must show to determine their "eligible immigration status" is simply "[a] form designated by ICE as acceptable evidence of immigration status." Ord. § 3(B)(f)(3)(ii)(b). The city argues that any legal resident may rent an apartment in Farmers Branch regardless of that resident's eligibility for federal housing subsidies. The city also argues that the Ordinance does not create new immigration regulations and that the stated intention of the city "is not an attempt or effort to promulgate new and additional Immigration Laws or to conflict in any manner with the Federal Government's promulgation and enforcement of Immigration Laws." *Id*. § 4.

The city contends that the Ordinance does not violate the first *De Canas* test because it is not a "regulation of immigration" that is "a determination of who should or should not be admitted into the country, and the conditions under which a *legal* entrant may remain." 424 U.S. at 355 (emphasis

added).  The city argues that the Ordinance does not affect any individual who is legally resident in the United States.

The city further contends that the court must construe the Ordinance under the assumption that the city intended for the Ordinance to comply with the Constitution.  The city argues that the court must read the Ordinance as simply adopting federal immigration standards.  According to Defendant, the Ordinance must be presumed to be effective and to not intentionally conflict with the Constitution.  Tex. Gov. Code § 311.021.  "Statutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with the state and federal constitutions." *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex. 1990); *see also United States v. Mississippi Dep't of Public Safety*, 321 F.3d 495, 500 (5th Cir. 2003) ("[T]here is a time-honored presumption that a statute is a constitutional exercise of legislative power.") (internal citations, quotations, and brackets omitted).

The plain language of the Ordinance adopts definitions consistent with 24 CFR 5, which, as previously described, limits those with "eligible immigration status" to those noncitizens who are eligible for federal housing subsidies.  The court has construed the Ordinance pursuant to the plain language of the statute, and it is not possible to construe the Ordinance as complying with the Constitution.  The title of the Ordinance itself incorporates the HUD regulations, as the title includes this phrase: "Adopting revised apartment complex rental licensing standards, mandating a citizenship certification requirement pursuant to 24 CFR 5 et seq."  Ord. Title.

The court determines that despite the city's contention that it intended to adopt federal immigration standards as required by the first *De Canas* test, it has actually adopted federal housing regulations used to determine noncitizens' eligibility for assistance.  The Ordinance, therefore, is

preempted because it is a "regulation of immigration," a regulatory power reserved for the federal government. The Ordinance is rife with references to the HUD regulations, and it is clear that the Ordinance depends on the scheme set out by the HUD regulations: the Ordinance is titled, in part, "mandating a citizenship certification requirement pursuant to 24 CFR 5 et seq." and the preamble states "the U.S. Department of Housing and Urban Development regulations stipulate that rental tenants must submit evidence of citizenship or immigration status consistent with 24 CFR 5, et seq.;" "24 CFR 5, et seq., the general HUD provisions, provide for a uniform and non-discriminatory certification process for citizenship and immigration status;" "the HUD certification process has been in place for many years and is currently in use;" "the City Council finds and determines that the benefits and protections provided through the HUD citizenship and immigration status certification processes would also benefit the City;" and "the City of Farmers Branch has determined that it is a necessity to adopt citizenship and immigration certification requirements for apartment complexes to safeguard the public, consistent with the provisions of 24 CFR 5, et seq." *Id.* Title, Preamble.

The Ordinance is replete with references to "eligible immigration status," and the Ordinance defines this term as "consistent with 24 CFR 5.504." *Id*. § 3(B)(f)(1). As Plaintiffs have pointed out, the HUD regulations simply define which noncitizens are eligible for federal housing subsidies, *see* 24 CFR 5.508(a); the HUD regulations do not determine whether a person is legally or illegally in the United States. The HUD regulations require that immigration status is verified through an automated INS system or by INS itself. *See* 24 CFR § 5.512(c)-(d). Moreover, certain individuals who are legally in the country are statutorily excepted from receiving federal housing assistance. 42 USC § 1436a(a)(1) ("excluding, among others, alien visitors, tourists, diplomats, and students

who enter the United States temporarily"). Accordingly, the Ordinance affects the "conditions under which a legal entrant may remain," *De Canas*, 424 U.S. at 355, because it excludes certain legal residents from renting an apartment in Farmers Branch.

The city's own evidence also establishes that the Ordinance relies heavily on the HUD regulations for the application and enforcement of the Ordinance. The city sent a letter to apartment complexes in Farmers Branch describing the "verification form requirements" adopted by city staff for compliance with the Ordinance. Docket No. 74, Def.'s App. 62. For a "noncitizen with eligible immigration status," the letter requires a signed declaration of "eligible immigration status" and one of several documents described in the letter. *Id*. at 62-63. The letter lists the following acceptable documents: Form I-551, Form I-94, Form I-668, Form I-668B, "receipt issued by the DHS indicating that an application for a replacement document has been entered and verified, and the document would fall into an aforementioned category," or "any other form designated by the Immigration and Customs Enforcement Department as acceptable evidence of immigration status." *Id*. The letter to the apartment complexes included samples of a declaration format, verification consent form, and owner's summary of family. *Id*. at 64-68. On the face of these documents, it is clear that they are HUD forms; each document states "HUD Occupancy Handbook" on the bottom of each page. *Id*. The "declaration format" also lists documents that must be submitted by a noncitizen with "eligible immigration status" and includes all the forms included in the letter from the city but omits the last category of documentation, any form designated by ICE. *Id*. at 64-65.

The city points out that the Ordinance specifically requires that a noncitizen show a "form designated by ICE as acceptable evidence of immigration status," Ord. § 3(B)(f)(3)(ii)(b), and the city argues that the Ordinance "does not purport to adopt those HUD regulations in their entirety,

nor does it deny housing to certain individuals who are legally entitled to reside in this country, but who are not eligible to reside in public housing." Docket No. 73, Def.'s Resp. 12. The court is not persuaded by the city's argument. While noncitizens must provide evidence of a "form designated by ICE," this is only one of three pieces of evidence that such an individual must provide. The Ordinance requires that a noncitizen provide as evidence of "eligible immigration status:"

a. A signed declaration of eligible immigration status;
b. A form designated by ICE as acceptable evidence of immigration status; *and*
c. A signed verification consent form.

Ord. § 3(B)(f)(3)(ii) (emphasis added). A noncitizen is still bound by the requirement of a declaration of his or her "eligible immigration status," a term defined consistent with 24 CFR 5 and the HUD regulations regarding housing subsidy eligibility.

The court determines that the city's reliance on the HUD regulations and documents demonstrates that the city is doing more than adopting federal immigration requirements; the city adopts federal regulations regarding housing benefits to noncitizens and uses those regulations to define which noncitizens may rent an apartment in Farmers Branch. The Ordinance's clear intent to adopt the "benefits and protections provided through the HUD citizenship and immigration status certification processes," the use of the term "eligible immigration status" as defined in the context of federal housing subsidies, the requirement that noncitizens file a declaration regarding their "eligible immigration status," and the use of HUD definitions and forms is in effect defining immigration status for the purpose of the Ordinance. Because this definition is not consistent and coextensive with federal immigration standards, the city has attempted to regulate immigration in violation of the Constitution and the Supremacy Clause. The HUD regulations do not include all noncitizens lawfully in the country under federal immigration standards; because the Ordinance

relies on or adopts HUD regulations, certain legal noncitizens will be excluded from renting an apartment in Farmers Branch. For example, a landlord who rents to certain noncitizens who are legally in the country temporarily, such as students, would be subject to criminal sanctions. Accordingly, the court concludes that the Ordinance relies on the HUD regulations and thus is an impermissible "regulation of immigration."

### b. Verification of Immigration Status

Plaintiffs also contend that because the Ordinance requires the determination of immigration status to be made by the owners and property managers of apartments in Farmers Branch, the Ordinance essentially deputizes these private individuals as federal immigration officials and takes a federal function away from the federal government. The Ordinance places the burden initially on the owner or property manager to ask tenants or potential tenants for evidence of citizenship or immigration status. Ord. § 3(B)(f)(3). Tenants may appeal to a City Building Official if they are denied occupancy because of immigration status. *Id*. § 3(B)(f)(3)(viii).

The city argues that its Ordinance is not a "regulation of immigration" because it does not determine who may be in the country and because the Ordinance simply requires the collection of immigration information. Specifically, the city argued that the "Ordinance's provisions simply require that an apartment employee *collect and maintain* certain immigration documentation." Docket No. 94, Def.'s Supp. Resp. 5 (emphasis in original). The city also argued at the preliminary injunction hearing that any adoption of the HUD regulations is limited to the HUD document collection requirements: "The only portion of the HUD regulations that are adopted by the ordinances [sic] are what documentation do you need to present. . . . All the ordinance says is that HUD has a documentation recordkeeping scheme that has been in place and adopts that as the

recordkeeping system adopted by the City." Trans. 57:11-13, 17-20. Finally, the city argues that its collection of immigration documents will assist the federal government in enforcing immigration laws.

Defendant argues that document collection related to immigration status by states occurs regularly in a variety of contexts. The majority of the examples provided by Defendant, however, is based upon *federal* law. *See* 8 USC § 1324a(b) (federal law prohibiting unlawful employment of aliens); 42 USC § 1320b-7(b)(1) (Aid to Families with Dependent Children); 42 USC § 1320b-7(b)(2) (Medicaid); 7 USC § 2015(f) (Food Stamps). Although these examples include state collection of immigration status, it remains that these regulations are issued by the federal government, not a city.

Defendant does cite examples of state determination of immigration status for purposes of voter's registration and driver's licenses; however, these programs appear to wholly adopt federal immigration standards. Defendant cites *Gonzalez v. Arizona*, 485 F.3d 1041 (9th Cir. 2007), for the proposition that a state may require evidence of citizenship to obtain a voter's registration card. The Arizona law at issue provided:

> "Satisfactory evidence of citizenship" may be shown by including, with the voter registration form, any of the following: the number of an Arizona driver's license or non-operating identification license . . .; a legible copy of a birth certificate; a legible copy of a United States passport; United States naturalization documents or the number of the certificate of naturalization; "other documents or methods of proof that [may be] established pursuant to" federal immigration law."

*Id*. at 1047 (brackets in original). Defendant cites to a section of the Texas Transportation Code, arguing that Texas also requires proof of immigration status to obtain a license. The section,

applicable to "agreements with foreign countries," also appears consistent with federal immigration standards:

> A person who is not a citizen of the United States must present to the department documentation issued by the United States agency responsible for citizenship and immigration authorizing the person to be in the United States before the person may be issued a driver's license under an agreement under this section.

Tex. Transp. Code § 521.0305(c). Additionally, Defendant cites a Georgia case for the proposition that Georgia also requires proof of immigration status to obtain a license. *John Doe No. 1 v. Georgia Dep't of Public Safety*, 147 F. Supp.2d 1369 (N.D. Ga. 2001). While the court dismissed the argument that the statute was a "substantial burden upon national immigration policy," the challenged law applied federal immigration standards. *Id.* at 1376. The Georgia law provides: "no person shall be considered a resident for purposes of this chapter unless such person is either a United States citizen or an alien with legal authorization from the U.S. Immigration and Naturalization Service." Ga. Code Ann. § 40-5-1(15).

Plaintiffs argue that the Ordinance requires landlords to make determinations of immigration status. The Vasquez Plaintiffs point out that landlords must determine whether a document is sufficient to show "eligible immigration status." Ord. § 3(B)(f)(2). The Ordinance requires that landlords "request *and review* original documents of eligible citizenship or immigration status." *Id.* at § 3(B)(f)(4)(i) (emphasis added). Finally, the Vasquez Plaintiffs point to Defendant's own exhibit, the letter from the city to apartment complex owners and managers, which states that apartment owners and managers "must *verify* citizenship or immigration status for each occupant of an apartment prior to entering into a new lease agreement." Docket No. 74, Def.'s App. 62 (emphasis added).

The court rejects the city's thinly-veiled argument that tries to distinguish its Ordinance as no more than a system of recordkeeping that is intended to assist the federal government in its enforcement of immigration laws. While the city may describe the Ordinance in this way, it is clear that the actual text of the Ordinance makes the provision of immigration documentation a "prerequisite" to the renting of an apartment in Farmers Branch. Ord. § 3(B)(f)(2) ("The owner and/or property manager shall require as a prerequisite to entering into any lease or rental arrangement . . . the submission of evidence of citizenship or eligible immigration status for each tenant family consistent with subsection (3)."). In addition, a landlord is "prohibited from allowing the occupancy of any unit by any family which has not submitted the required evidence of citizenship or eligible immigration status." *Id*. at § 3(B)(f)(4)(ii).

The Ordinance itself does not define the term "prerequisite," but the term as commonly defined means "something that is necessary to an end or to the carrying out of a function." Merriam-Webster's Collegiate Dictionary 981 (11th ed. 2004). In other words, before a landlord can even enter into a lease or rental agreement, the landlord must take the necessary first step of requiring the submission of documentation related to citizenship or immigration status. Ord. § 3(B)(f)(2). Although it is not spelled out in black and white, the dominant, and perhaps sole, purpose of this provision of the Ordinance is to prevent illegal immigrants from renting apartments in Farmers Branch; otherwise, there would be no need to verify immigration status as a prerequisite for entering into a lease. Of course the city, through legal legerdemain and sophistication, has avoided including in the Ordinance any specific reference to denying rental apartment units to illegal immigrants, but considering the Ordinance as a whole, its purpose is unmistakably clear.

The city's argument that it is acting to support the federal government's immigration enforcement is specious. Local enforcement of federal immigration law is sanctioned by section 287(g) of the Immigration and Naturalization Act which provides:

> [T]he Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . , may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 USC § 1357(g)(1). Nothing in the Ordinance demonstrates the city's intent to assist the federal government in this manner.

The Ordinance here requires more than the collection of immigration documents. The Ordinance puts the burden of verifying immigration status upon landlords. In *LULAC*, the district court held that a California proposition was a regulation of immigration, in part, because the law required that state agents determine immigration status. 908 F. Supp. at 770. That court noted that:

> state agents are unqualified – and also unauthorized – to make independent determinations of immigration status. . . . Indeed, determinations of immigration status by state agents amounts to immigration regulation whether made for the purposes of notifying aliens of their unlawful status and reporting their presence to the INS or for the limited purpose of denying benefits.

*Id*. The court determines that the Ordinance burdens private citizens and city officials with making immigration status decisions based upon a scheme that does not adopt federal immigration standards. Accordingly, the Ordinance is a "regulation of immigration" inconsistent with the federal government's rights and in violation of the first *De Canas* test. Plaintiffs also argue that the Ordinance fails the second and third *De Canas* tests. In light of the court's ruling with respect to

the first *De Canas* test, it does not consider the parties' arguments regarding the second and third

*De Canas* tests.

## 2. Savings Clause

Defendant argues in the alternative that if the court concludes that the Ordinance as drafted

is preempted, the court should sever provisions pursuant to the savings clause of the Ordinance.

Section 4 provides:

> If any section, paragraph, subdivision, clause or phrase of this
> Ordinance shall be adjudged invalid or held unconstitutional, the
> same shall not affect the validity of this Ordinance as a whole or any
> part of any provision thereof other than the part so decided to be
> invalid or unconstitutional.

Ord. § 4. At the preliminary injunction hearing, the city provided the court with three exhibits

demonstrating various ways it believes the court could sever certain portions of the Ordinance in

order to craft an Ordinance that is not preempted by the Supremacy Clause. Specifically, Version

One omits all references to the HUD regulations and requires noncitizens to provide only a "signed

declaration of eligible immigration status." Version Two omits all references to the HUD

regulations and requires noncitizens to present only a "form designated by ICE as acceptable

evidence of immigration status." Version Three omits all references to any federal regulations and

leaves the rest of the Ordinance, for the most part, intact. In its supplemental brief, Defendant

effectively offers a fourth version by arguing that if the term "eligible immigration status" is

problematic, the court could simply omit the word "eligible" from the phrase throughout the text of

the Ordinance.

Plaintiffs argue that the court should not engage in rewriting the Ordinance, that the portions

the city argues should be severed are not independent and cannot be severed, that severing

references to the HUD regulations would violate the city's legislative intent, that severing any portion of the Ordinance at this stage of the proceedings is improper, and that the three proposals submitted by the city are still preempted by federal law and are unconstitutional in other ways.

At the preliminary injunction hearing, one of the city's attorneys acknowledged that "there are drafting issues to be addressed." Trans. 40:12-13. The court agrees that the Ordinance has "drafting issues." That the city has acknowledged problems with the Ordinance and has provided the court with four alternatives demonstrates the inherent weakness of the Ordinance. The court recognizes that the Fifth Circuit has considered and applied a savings analysis in the context of a preliminary injunction. *Planned Parenthood of Houston and Southeast Texas v. Sanchez*, 403 F.3d 324, 341-342 (5th Cir. 2005). Accordingly, the court considers whether the savings clause in the Ordinance allows the court to fashion any changes to the Ordinance to overcome the problems the Ordinance, as enacted, faces with regard to the Supremacy Clause.

"Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 126 S.Ct. 961, 967 (2006) (internal citations omitted). In that case, the Court noted three principles that a court must follow when trying to save an otherwise unconstitutional statute:

> First, we try not to nullify more of a legislature's work than is necessary, for we know that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people. . . . Second, mindful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting state law to conform it to constitutional requirements even as we strive to salvage it. . . . Third, the touchstone for any decision about remedy is legislative

> intent, for a court cannot use its remedial powers to circumvent the
> intent of the legislature.

*Id*. at 968-969 (internal citations, quotations, and brackets omitted).  In *Reno v. ACLU*, a case relied

upon by the city, the Court also noted that it has long held:

> It would certainly be dangerous if the legislature could set a net large
> enough to catch all possible offenders, and leave it to the courts to
> step inside and say who could be rightfully detained, and who should
> be set at large.  This would, to some extent, substitute the judicial for
> the legislative department of the government.

521 U.S. 844, 884 n.49 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)).  In *Reno*, the

Court also noted that a severability clause is "an aid merely; not an inexorable command."  *Id*.

(quoting *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924)).

The city's proposed revisions to the Ordinance would require the court to excise various

"whereas" clauses, references to federal regulations, and certain words and phrases of subsections

of the Ordinance.  No section of the Ordinance could be omitted entirely to prevent the preemption

of the Ordinance; the city proposes instead a line-by-line revision of the Ordinance to try to salvage

it.

The federal regulations relied upon by the Ordinance, the references to the HUD regulations,

and the term "eligible immigration status" are woven throughout the Ordinance.  The legislative

history that is available makes clear that the Farmers Branch City Council intended to adopt the

HUD regulations.  The minutes of the January 22, 2007 City Council meeting state: "City Attorney

Matthew Boyle summarized the changes in the proposed ordinance: . . . 3) adopts revised apartment

licensing standards based on HUD lease agreements . . . ."  Docket No. 100, Vasquez Pls.' App. 10.

The city asks the court to essentially rewrite the Ordinance by stripping phrases that are inextricably

intertwined to create a new Ordinance that clearly frustrates the city's original legislative intent; it

is not incumbent upon the court to write new legislation to save the Ordinance.  The court declines

to enforce the savings clause, concluding that the reliance on the HUD regulations was intentional

and that any attempt to rewrite the Ordinance would require the court to legislate by creating an

entirely new ordinance.  Moreover, even if the court did sever parts of the existing Ordinance, the

court determines that the resulting ordinance would likely be void for vagueness as described in the

following section.

The city's efforts to "save" the Ordinance and to rectify the acknowledged "drafting issues"

cannot succeed because the court cannot and will not engage in the legislative exercise of redrafting

the Ordinance.  The court therefore determines that there is no genuine issue of material fact with

respect to Plaintiffs' claims that the Ordinance is preempted, and they are therefore entitled to

judgment as a matter of law on these claims.

### D.    Due Process Claim

The court considers next Plaintiffs' claims that the Ordinance violates the Due Process clause

of the Fourteenth Amendment to the United States Constitution because it is void for vagueness.

The Fourteenth Amendment provides:  no state shall "deprive any person of life, liberty, or property,

without due process of law. . . ."  U.S. Const. amend. XIV § 1.  "[T]he void-for-vagueness doctrine

requires that a penal statute define the criminal offense with sufficient definiteness that ordinary

people can understand what conduct is prohibited and in a manner that does not encourage arbitrary

and discriminatory enforcement."  *Kolendar v. Lawson*, 461 U.S. 352, 357 (1983); *see also City of

Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("It is established that a law fails to meet the

requirements of the Due Process Clause if it is so vague and standardless that it leaves the public

uncertain as to the conduct it prohibits . . . .") (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966)).

Plaintiffs argue that the Ordinance fails to provide sufficient guidance to landlords who are responsible for enforcing the Ordinance and who are subject to criminal penalties for failure to comply with the Ordinance. Specifically, Plaintiffs argue that the Ordinance fails to identify who must perform the obligations and who is liable for violations of the Ordinance (because the Ordinance places the burden upon the "owner *and/or* property manager," that the Ordinance fails to identify which documents must be obtained and reviewed, and that the Ordinance creates inconsistent obligations upon property owners and managers. Plaintiffs argue that in light of the strict criminal liability for violation of the Ordinance, the court must find that the Ordinance is void for vagueness.

The city argues that the Ordinance contains clear standards, pointing to section 3(B)(f)(3)(i), which states the evidence requirements for U.S. citizens or nationals. The city also argues that the Ordinance expressly includes antidiscrimination provisions and that the city will provide training to landlords. The city also contends that because the Ordinance adopts the standards of ICE, landlords need not guess at what documents a potential tenant must provide.

The court determines that the Ordinance's vagueness with regard to the meaning of "eligible immigration status" and the lack of specificity with regard to the documentation requirements require the conclusion that the Ordinance is void for vagueness. The city's responses to the preemption and due process arguments demonstrate some tension: while the city has argued strenuously in response to the preemption arguments that the Ordinance does *not* adopt the HUD regulations, in response to the due process challenge, the city has argued that the regulations provide

clear guidance as to whom is eligible to rent in Farmers Branch. The city also presents inconsistency in a comparison of the text of the Ordinance and its own exhibits that include the documents provided as training materials to landlords. Docket No. 74, Def. App. 61-88. While the Ordinance refers to "form[s] designated by ICE as acceptable evidence of immigration status," Ord. § 3(B)(f)(3)(ii)(b), the sample documents are HUD documents that limit the acceptable documentation to those documents that establish eligibility for federal housing assistance. Docket No. 74, Def. App. 64-66.

A landlord, subject to criminal liability for violation of the Ordinance, relying on the city's documents, would not know whether he was criminally liable for renting to a noncitizen legally residing in the country who lacked the documents listed on the HUD declaration. *Id*. at 65. A landlord must also, as a prerequisite to entering a lease with a noncitizen, determine whether that potential tenant has a "form designated by ICE as acceptable evidence of immigration status." Ord. § 3(B)(f)(3)(ii)(b). The city maintains that it will provide training to landlords, but the evidence provided by the city itself demonstrates that it will use the HUD documents as its examples, creating confusion and uncertainty for landlords who desire to rent to individuals legally in the country but ineligible for federal housing assistance. The Ordinance, applied in a criminal context to landlords with no training or expertise in federal immigration law, fails to put these landlords on sufficient notice of what acts may be punished by the city.

The alternative versions of the Ordinance proposed by the city to solve the preemption problems also would be void for vagueness. The same problems apply to all three versions, which omit all references to the HUD regulations. The omission strips the Ordinance of the definitions of key terms creating even more uncertainty and confusion as to the meaning of the Ordinance.

Accordingly, the court concludes that the Ordinance fails to sufficiently define the offense that would subject a landlord in Farmers Branch to criminal penalties. Thus, the court determines that Plaintiffs have established that there is no genuine issue of material fact with respect to their Due Process claims, and they are entitled to judgment as a matter of law on these claims. Accordingly, the court **grants** Plaintiffs' Motion for Partial Summary Judgment.

## V.     Plaintiffs' Request for Permanent Injunction

Plaintiffs ask the court to permanently enjoin Defendant from effectuating or enforcing the Ordinance. The elements of a permanent injunction are essentially the same as those for a preliminary injunction "with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). To establish that it is entitled to a preliminary injunction, a plaintiff must demonstrate: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (iii) that greater injury will result from denying the temporary restraining order than from its being granted; and (iv) that a temporary restraining order will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before an injunction can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline,* 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993.

### A.     Actual Success on the Merits

The first element – actual success on the merits – has been established. Plaintiffs have succeeded on the merits of their claims that the Ordinance is preempted and violates the Due Process

clause of the Fourteenth Amendment to the United States Constitution, as they are entitled to partial summary judgment on these claims.

### B.     Threat of Immediate and Irreparable Harm

The court finds that Plaintiffs have also established the second required element, the threat of immediate and irreparable harm.  A party may be irreparably injured in the face of the threatened enforcement of a preempted law.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The court may enjoin state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution."  *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 145-147 (1908)).  Moreover, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Louisiana Seafood Mgm't Council, Inc. v. Foster*, 917 F. Supp. 439, 442 n.1 (E.D. La. 1996) (quoting 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2948.1, p. 160-161 (1995)).

The landlord Plaintiffs have established that they will be subject to fines and criminal penalties if they violate the Ordinance once it is in effect.  *See* Ord. § 6 ("[A]ny person violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $500 . . .").  The declarations submitted by Plaintiffs also establish that the Ordinance is likely to cause irreparable harm to the landlord Plaintiffs' business because the landlords will lose business to neighboring cities and because the Ordinance casts doubt on Farmers Branch landlords' ability to lease to corporate tenants or through the internet.

The tenant Plaintiffs have also established irreparable harm because the Ordinance creates uncertainty with regard to legal aliens without documentation sufficient under the Ordinance.  One

result of this uncertainty is that the tenant Plaintiffs may need to relocate and change jobs and schools, or remain in Farmers Branch and face eviction, all harms that may not be remedied by monetary damages. *E.g.*, *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-473 (5th Cir. 1985) ("[A]n injury is irreparable only if it cannot be undone through monetary remedies.") (internal citations and quotations omitted). Accordingly, the court determines that the second requirement has been met by Plaintiffs.

### C. Harm to the Plaintiffs versus Harm to Farmers Branch

The court also determines that the third element has been demonstrated, because greater injury will result from denying a permanent injunction than from granting it. *Clark*, 812 F.2d at 993. The city argues that the voters of Farmers Branch have expressed their approval of the Ordinance. The court recognizes the election results, but does not find that the voters' approval shows any harm to Farmers Branch by granting a permanent injunction. In the context of asking the court for a bond, the city has now had two opportunities to explain to the court what injury the city would face if the Ordinance was enjoined. The city could not demonstrate any specific, quantifiable harm to the city, but instead pointed to its "inability . . . to protect the health, safety, and welfare of the public." Trans. 98:16-18. Given that Plaintiffs have established the likelihood of irreparable injury, weighed against an abstract and hypothetical injury to the city, the court determines that denying a permanent injunction would be more harmful to Plaintiffs than any injury to Farmers Branch by granting the applications.

### D. The Public Interest

Finally, the court determines that a permanent injunction in this case is in the public interest. As the Fifth Circuit Court of Appeals has noted, the "public interest . . . does not extend so far as

to allow . . . actions that interfere with the exercise of fundamental rights." *Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338-339 (5th Cir. 1981). Given that the court has determined that the Ordinance is preempted by the Constitution and is void for vagueness, the public interest is served by enjoining the effective date and enforcement of a local law that the court has determined to be at odds with the Constitution.

## VI.     Conclusion and Permanent Injunction

All in all, the court concludes that only the federal government may determine whether an individual is legally in the United States. Farmers Branch, rather than deferring to the federal government's determination of immigration status, has created its own classification scheme for determining which noncitizens may rent an apartment in that city. Farmers Branch has failed to adopt federal immigration standards. The Ordinance adopts federal housing regulations that govern which noncitizens may receive housing subsidies from the federal government, not federal immigration standards that determine which noncitizens are legally in this country. Because Farmers Branch has attempted to regulate immigration differently from the federal government, the Ordinance is preempted by the Supremacy Clause. The city's attempts to save the Ordinance fail because the proposed revisions would require the court to engage in the legislative function of redrafting the Ordinance. Even if sections or phrases of the Ordinance could be severed, the Ordinance would suffer from the same– if not worse– vagueness problems.

The court, for the reasons herein stated, determines that the Villas and Vasquez Plaintiffs have shown that there is no genuine issue of material fact with respect to their claims that the Ordinance is preempted and that it violates the Due Process clause of the Fourteenth Amendment

to the United States Constitution. Accordingly, Plaintiffs are entitled to judgment as a matter of law on these claims and the court **grants** Plaintiffs' Motion for Partial Summary Judgment.

Plaintiffs have established that they are entitled to the entry of a permanent injunction. The court therefore **orders** that the City of Farmers Branch, Texas, and its officers, agents, servants, employees, representatives, and attorneys, **are hereby permanently enjoined and prohibited from effectuating or enforcing Ordinance 2903.**

When it granted the applications for a temporary restraining order, the court required the Villas Plaintiffs and the Vasquez Plaintiffs to each pay a bond in the amount of $1,500. Plaintiffs filed these bonds in cash. The purpose of such a bond is to provide "security . . . for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined and restrained." Fed. R. Civ. P. 65(c). The court has determined that Plaintiffs have succeeded on their claims and that a permanent injunction is warranted. Accordingly, the court **dissolves** the bond and **directs** the clerk of the court to return these bonds to the Villas Plaintiffs and the Vasquez Plaintiffs.

**It is so ordered** this 28th day of May, 2008.

Sam A. Lindsay
United States District Judge